**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Criminal Action No. 16-cr-00057-MSK

**UNITED STATES OF AMERICA,**

    Plaintiff,

v.

**RICHARD WYATT,**

    Defendant.

**OPINION AND ORDER DENYING MOTION TO SUPPRESS ALL EVIDENCE SEIZED IN ATF SEARCH**

THIS MATTER comes before the Court on Defendant, Richard Wyatt's, Motion to Suppress (**# 38**) and the Government's Response (**# 53**).

This motion concerns a search of Mr. Wyatt's business by the ATF. He seeks suppression of all evidence seized due to misconduct by officers conducting the search. Notably, he does not allege that there were any defects in the warrant executed by the ATF, nor that the ATF exceeded the scope of the warrant when seizing evidence. Instead, Mr. Wyatt argues that the <u>manner</u> in which the ATF exercised the warrant so exceeded the Fourth Amendment's guarantees that suppression of <u>all</u> evidence seized pursuant to the warrant is required. In particular, Mr. Wyatt asserts that the ATF search violated his[1] Fourth Amendment rights because

---

[1] As the Court noted in its Order and Opinion (**# 63**) denying Mr. Wyatt's Motion to Suppress the IRS search, the Court has some doubt that Mr. Wyatt has standing to bring this challenge. Gunsmoke, Inc. is a corporation, and the search warrant was issued for Gunsmoke, Inc.'s premises and property, not Mr. Wyatt's. "The guarantees of the Fourth and Fifth Amendments are essentially personal privileges that cannot be projected to the seizure of papers and effects of another or to suppress the incriminating aspects of such records." *Galbraith v.*

1

ATF agents: 1) damaged his personal property during the search; 2) detained him during the search; and 3) purposefully exposed him to media coverage.

## I. Facts

For purposes of this motion, the factual record is, primarily, an oral proffer made by Mr. Wyatt's counsel at a hearing on October 18, 2016 **(# 62)**. (Mr. Wyatt also relies on certain physical exhibits – namely, photographs and a video -- that illustrate certain aspects of the contentions in the proffer.) That hearing concerned a separate motion to suppress, arising out of the same search. At the conclusion of that hearing, the Court noted the pendency of the instant motion by Mr. Wyatt, seeking "blanket suppression" of the fruits of the ATF search. To determine whether a further evidentiary hearing was necessary on that motion, the Court invited Mr. Wyatt's counsel to make a proffer of the evidence he would elicit, were an evidentiary hearing to be held. The Court summarizes that proffer below, taken in the light most favorable to Mr. Wyatt.

In 2009, the ATF began investigation of Mr. Wyatt and his business, Gunsmoke, Inc., with regard to suspicions that they sold firearms without proper federal licenses. In 2015, the ATF obtained a warrant to search Gunsmoke, Inc.'s business premises and to seize evidence of firearms sales and gunsmithing services.

ATF agents executed the warrant on March 31, 2015. When Mr. Wyatt pulled into Gunsmoke's parking lot at approximately 9:00 a.m., armed Wheat Ridge police officers pulled up behind him. Mr. Wyatt first engaged with Wheat Ridge officers, with whom he was familiar.

---

*United States*, 387 F.2d 617, 618 (10th Cir. 1968); *see United States v. Curtis*, 537 F.2d 1091, 1094 (10th Cir. 1976). However, because some of the property that was damaged belonged to Mr. Wyatt, personally, the Court will assume, without deciding, that he has standing to bring the motion.

The Wheat Ridge officers indicated that ATF officials planned to search the building, that Mr. Wyatt would be detained during that time, and that Mr. Wyatt would be given an opportunity to unlock the building and supply the ATF agents with codes to access areas so that the ATF agents would not have to damage or destroy doors or other areas.  Although that discussion was relatively relaxed, Mr. Wyatt became agitated and angry when an ATF agent approached.  Mr. Wyatt and the ATF agent had a "contentious argument," in which Mr. Wyatt repeatedly demanded to see the warrant and the ATF agent demanded Mr. Wyatt's cooperation in the search.  During that argument, while still sitting in his vehicle, Mr. Wyatt reached for his phone.  The ATF agent reached into the vehicle and took the phone from Mr. Wyatt, then called for assistance from other agents.  Those agents removed Mr. Wyatt from the vehicle and handcuffed him.

Mr. Wyatt again asked to see the warrant and insisted on calling his lawyer.  The ATF agent showed Mr. Wyatt a copy of the warrant, and they argued at some length – perhaps as long as half an hour -- over whether the property address of the building was indeed the address shown on the warrant.[2]  Eventually, Mr. Wyatt agreed to provide the ATF agents with keys to the building and codes to provide them access to interior areas.  Mr. Wyatt demanded to be permitted to leave the premises and the ATF agents apparently offered him two options: he could stay in the parking lot during the search and be detained and denied access to his phone, or he could leave the premises, but if he left the premises and returned, he would be arrested.  Mr. Wyatt states that he expressed an intention to take the latter option and leave.  Before he could leave, however, a Wheat Ridge police officer began questioning him about a related criminal case, preventing him from leaving.  This questioning lasted some 30-45 minutes.

---

[2]    This Court has already found that the address on the warrant adequately described the building where Gunsmoke was located.  *Docket* # 63 at 8-9.

3

At the conclusion of that questioning, ATF agents allowed Mr. Wyatt to leave the premises, telling him that they would call him when they needed him to return. Mr. Wyatt then left. Later that evening, ATF agents called to have him return to open a safe in the building. Mr. Wyatt notes that, at some point prior, he had stated to unidentified persons that he "did not want to be exposed to media coverage [and] humiliation."[3] When he returned to the premises, "all of the media [was] there." He attempted to enter inconspicuously through the back of the building, but the door was apparently locked. He called the ATF agents to ask them to open the back door, but they "march[ed] him here in front of the cameras to the [front] section and into the shop."

Upon entering the shop, Mr. Wyatt observed various forms of damage that had been caused by the ATF agents. Specifically, he described (and evidenced via exhibits): (i) "various mementos and pictures, some of them of great value, that were either hanging on the wall or were very carefully put away" which "ended up with broken frames and basically deposited on the ground"; (ii) apparently, as many as three prints or images were "simply removed" from the building, despite not being listed in the warrant; (iii) gun cases that various weapons were kept it were "thr[own] into a pile on the floor" and one gun case "was torn up and thrown into a pile": (iv) two valuable weapons were "thrown into this pile on the floor [ ] and left there," at least one of them suffering a scratch in the process (although Mr. Wyatt's counsel focused instead on "the indignity" that one of the weapons had sentimental value to Mr. Wyatt and was kept on a shelf in his office, yet "it was . . . thrown on the floor and left in this manner"); (v) other weapons, prints,

---

[3] Mr. Wyatt was involved with a television show that focused on his business. Because of his higher profile, he may have been the subject of more intense media curiosity.

a collection of badges, and a scale for weighing gold were thrown on the floor[4]; (vi) "an antique cash register of significant value [ ] was broken"; and (vii) that ATF agents located a "poster" (shown in exhibits to be a large photograph of President Obama with a speech bubble referencing him coming to take away one's guns) that Mr. Wyatt had put away in his office and that the agents "put it at his front door . . . as somewhat of a taunting act."

At the conclusion of the proffer, Mr. Wyatt's counsel summarized the various offenses as "gratuitous damage, the things that just weren't necessary, valuable prints, even these, you know, throwing collector item handguns down on the floor, things that simply made no sense[, ] 30 minutes of . . . constant requests to have the right to read the warrant and know what's in the warrant, and instead, what they did is they continued to detain him and part of it was the goal of having him questioned by other police officers on related cases."

The ATF seized a wide array of business records and other documents, numerous firearms, Denver Sheriff badges, and various other physical items. The Court does not understand Mr. Wyatt to contend that any of these items fell outside the scope of the search warrant or were otherwise seized in violation of any specific 4th Amendment protection. Instead, the Court understands Mr. Wyatt to argue that the conduct described above – the careless handling of and damage to property not subject to the warrant, the delay in allowing Mr. Wyatt to leave the premises, and the actions by the ATF that exposed him to media scrutiny – collectively render the manner of the search so unreasonable as to violate the Fourth Amendment, such that the only appropriate remedy is "blanket" suppression of all evidence seized pursuant to the warrant. At the Court's request, after Mr. Wyatt's proffer, the parties filed

---

[4] Although counsel's proffer focuses significantly on items being "thrown on the floor" or "left in a pile," the Court does not understand Mr. Wyatt to contend that these items were damaged in any way, except as specifically noted.

5

additional briefing **(# 64, 65)**[5] addressing whether the proffered facts could, if taken as true, warrant such suppression.

## II.   Analysis

The Fourth Amendment protects individuals against unreasonable search and seizures. *See* U.S. CONST. amend. IV. In conducting a search, agents are limited to the scope of the applicable warrant and have a duty to execute a search in a reasonable manner. *United States v. Maestas*, 2 F.3d 1485, 1491 (10th Cir. 1993); *United States v. Mendoza*, 817 F.3d 695 (10th Cir. 2016); *United States v. Basham*, 268 F.3d 1199 (10th Cir. 2001); *Lawmaster v. Ward*, 125 F.3d 1341 (10th Cir. 1997). Failure to conform to these requirements violates an individual's Fourth Amendment rights. *Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir. 1985).

It is important to note, however, that not every constitutional violation, and not every 4th Amendment violation, necessarily results in the suppression of evidence. *See Wong Sun v. United States,* 371 U.S. 471, 487–88 (1963); *United States v. Shareef*, 100 F.3d 1491, 1508 (10th Cir. 1996). As a remedy for 4th Amendment violations, suppression of evidence is designed to deter future unconstitutional police conduct. *Davis v. United States*, 564 U.S. 229, 236 (2011). Suppression is often characterized as a "last resort," primarily because exclusion of evidence comes at substantial societal cost, often resulting in the guilty avoiding conviction. *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Therefore, to be entitled to a remedy of suppression, a defendant must first establish that there was a violation of his 4th Amendment rights, and second, that suppression is the appropriate remedy. *United States v. Leon*, 468 U.S. 897, 906 (1984) ("Whether the exclusionary rule is appropriately imposed . . . is a separate issue from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were

---

[5]   Mr. Wyatt's brief **(# 65)** is captioned as a motion. For the reasons set forth herein, that motion is denied.

violated by police conduct"); *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000); *United States v. Orozco*, 575 F.Supp.2d 1191, 1207 (D. Colo. 2008).

Generally, suppression is warranted only where there is a causal connection between the illegal police conduct and the evidence obtained; in other words, where, but-for the illegal conduct, the contested evidence would not have been discovered. *See, e.g., Hudson*, 547 U.S. at 592; *United States v. Hargus*, 128 F.3d 1358, 1363 (10th Cir. 1997) ("If evidence is illegally seized, the general rule is that only the improperly seized evidence, not all of the evidence, must be suppressed, unless there was flagrant disregard for the terms of the warrant"). In circumstances where a 4th Amendment violation occurs but suppression is not warranted, the individual may instead seek civil damages through an action under *Bivens* or 42 U.S.C. § 1983. *See, e.g., Wilson v. Layne*, 526 U.S. 604 (1999); *Hanlon v. Berger*, 526 U.S. 808 (1999).

A. <u>Suppression Resulting From Flagrant Disregard for Warrant's Limitations</u>

In cases where police misconduct is particularly egregious, broad (or, as some courts have described, "blanket") suppression may be warranted even without a causal connection between the misconduct and the evidence. "Blanket suppression" is typically reserved for instances where officers completely ignore a warrant's limitations and treat a search as a general "fishing expedition," rummaging through property for any indication of broad criminal activity. *See United States v. Webster*, 809 F.3d 1158 (10th Cir. 2016) (blanket suppression is warranted where searches conducted pursuant to a warrant turn into general searches in disregard of the particularity requirement); *United States v. Le*, 173 F.3d 1258, 1270 (10th Cir. 1999); *United States v. Moraga*, 76 Fed App'x 223, 229 (10th Cir. 2003); *see also United States v. Shi Yan Liu*, 239 F.3d 138, 140-41 (2d Cir. 2000) (the rationale for blanket suppression is that a search that greatly exceeds the bounds of a warrant and is not conducted in good faith essentially becomes

an impermissible general search); *United States v. Squillacote*, 221 F.3d 542, 556 (4th Cir. 2000) ("The extraordinary remedy of blanket suppression of all evidence seized should be used only when the violations of the warrant's requirements are so extreme that the search is essentially transformed into an impermissible general search") (*quoting United States v. Chen*, 979 F.2d 714, 717 (9th Cir. 1992)).

The seminal case in the 10th Circuit for this proposition is *United States v. Medlin*, 842 F.2d 1194 (10th Cir. 1988). There, federal officials obtained a warrant to seize "illegally possessed and/or stolen firearms" from the defendant. The federal officials, accompanied by local police, executed the warrant, seizing 130 firearms. However, during the search, the local officers also proceed to search for any other stolen property that might be evidence of state crimes, eventually seizing more than 600 additional items, none of which were covered by the warrant. After concluding that the federal officers were responsible for the seizures made by the local officials, the 10th Circuit took up the question of whether suppression of the properly-seized firearms was warranted. Describing the general rule as "evidence which is properly seized pursuant to a warrant must be suppressed if the officers executing the warrant exhibit 'flagrant disregard' for its terms," the court found that standard to be satisfied by the local officers' conduct. *Id.* at 1198-99. The court's reasoning was that "[w]hen law enforcement officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant." *Id.* at 1199.

The rule in *Medlin* has been consistently applied in similar cases. For example, in *United States v. Foster*, 100 F.3d 846, 849 (10th Cir. 1996), officers flagrantly disregarded the scope of a warrant authorizing seizure of marijuana and guns, searching and seizing all items of "value,"

such as electronics, videotapes, a lawn mower, coins, knives, and jewelry. *See Foster*, 100 F.3d at 849-50. Finding that "the officers here flagrantly disregarded the terms of the warrant in seizing property," and relying in *Medlin*, the court concluded that suppression of the otherwise properly-seized marijuana and weapons was required. *Id.* at 851. (The court also rejected an argument that suppression was appropriate only if officers both sought and executed the warrant in bad faith. *Id.*). By contrast, the 10th Circuit found that "no "indiscriminate rummaging or hours of ransacking" occurred where officers, armed with a warrant to seize a rifle and accompanying ammunition that had been used in a prior shooting, proceeded to discover the stated evidence in proximity to numerous other firearms, other weapons and paraphernalia, (both firearms and otherwise), a pipe bomb, and welding equipment that could have been used to build the pipe bomb, all of which officials seized. *U.S. v. Sells*, 463 F.3d 1148, 1162 (10th Cir. 2006). The court described the *Medlin* rule as one in which "flagrant disregard [for] the permissible scope, duration, and intensity of the search" permitted by the warrant "would require the 'extreme remedy' of total suppression," but concluded that the facts there did not demonstrate such disregard. *Id.*

The 10th Circuit also found no basis for suppression in *United States v. Webster*, 809 F.3d 1158 (10th Cir. 2016). There, two teams of local officers executed a warrant to seize drugs and drug paraphernalia from the defendant's home. The execution was accomplished by the first team, a group specializing in forced entries, entered and secured the defendant's home, followed by a narcotics team that actually conducted the search for and seizure of drugs and other items mentioned in the warrant. At some point thereafter, the defendant noticed that other items of his personal property, including cash, a cell phone, and a game console were missing. Although the defendant proceeded to plead guilty to the drug charges, he later learned from FBI officials that

9

certain members of the forced entry team that executed the warrant had been discovered to be stealing personal property during searches, and one member had been found in possession of the defendant's game console, among other items. The defendant sought to withdraw his guilty plea and seek suppression of the fruits of the warrant, but the 10th Circuit rejected the argument. Carefully distinguishing *Medlin* and *Foster*, the court observed that: (i) unlike *Medlin*, there was no evidence that members of the narcotics team who actually seized the drug evidence knew of or condoned the forced entry officers' taking of the defendant's other property; and (ii) unlike *Foster*, the narcotics officers did not unduly extend their time in the defendant's house in order to search for other evidence beyond that listed in the warrant. *Id.* at 1169-70.

In sum, blanket suppression is predominantly applied where agents grossly disregard the specific limits of a warrant and proceed to search for and seize property that is entirely unrelated to that authorized by the warrant.

Here, Mr. Wyatt's proffer does not describe the type of flagrant disregard for a warrant's terms shown in cases like *Medlin* or *Foster*. Mr. Wyatt does not allege that ATF agents seized a large quantity of personal property falling outside of the scope of the warrant, nor that agents needlessly prolonged their exploration of the Gunsmoke property in order to do so. At best, Mr. Wyatt's proffer seems to suggest that ATF agents may have[6] removed as many as three "prints" – the Court understands this to mean framed posters, photos, or other artwork – from the building, apparently without authorization in the warrant. Although the Court does not condone officers ever seizing any item of property beyond that authorized by a warrant, the Court finds that, in the circumstances presented here, the improper removal of as many as three prints would be *de minimis*, particularly in light of the record that reflects a warrant seizure inventory that runs

---

[6] Mr. Wyatt's own proffer is somewhat uncertain as to how many – if any – prints were missing, much less whether they were actually taken by the ATF during the search.

more than 50 pages, listing hundreds of items whose seizure Mr. Wyatt does not challenge. Certainly, the Court would consider suppression of the prints themselves, were the Government to attempt to offer them as evidence and Mr. Wyatt showed that they were improperly seized. But as a basis for suppression of all of the evidence seized during the execution of the warrant, the Court cannot say that the improper taking of the three prints somehow converted the ATF agents' search from a particularized to a general one, akin to those of *Medlin* or *Foster*. Mr. Wyatt's remedy for the lost prints will have to be sought via an action for civil damages.

### B. Suppression Resulting From General Disregard for Constitutional Rights

Suppression of evidence is also sometimes warranted where law enforcement acts particularly reprehensibly, with flagrant disregard for a suspect's constitutional rights. *U.S. v. Edwards*, 666 F.3d 877, 886 (4th Cir. 2011); *United States v. Thompson*, 667 F.Supp.2d 758 (S.D. Ohio 2009). The question of whether law enforcement officers acted with such extreme disregard for the intended intensity of a search that suppression is required to deter such conduct is resolved on a case by case basis. *United States v. Penn*, 647 F.2d 876, 882 n. 7 (9th Cir. 1980), *cert den'd*, 449 U.S. 903.

Here, Mr. Wyatt's proffer can be generally divided into three specific categories: (i) ATF agents needlessly damaged his property; (ii) the agents detained him for an unreasonable amount of time; and (iii) the agents exposed him to negative media coverage. The Court examines each category separately, before considering them as a whole.

#### 1. Property Damage

Damage to or destruction of property that is not reasonably necessary to effectively execute a search warrant violates the Fourth Amendment. *United States v. Becker*, 929 F.2d 442, 446 (9th Cir. 1991); *Tarpley v. Greene*, 684 F.2d 1, 9 (D.C. Cir. 1982). However, courts also

recognize that, in some circumstances, minor, incidental, or accidental property damage is sometimes an unavoidable effect of a warrant-permitted search. *Dalia v. United States*, 441 U.S. 238, 258 (1979). A court considers the extent of the property damage and the particular facts to determine whether the extent of damage is reasonable in light of the need for officers to comprehensively and effectively conduct the intended search. *United States v. Ramirez*, 523 U.S. 65, 71 (1998); *Becker*, 929 F.2d at 446-47. A Fourth Amendment violation occurs where offers act unreasonably or maliciously to damage property; damage that results from mere negligence by the officers in the course of the search is not sufficient. *Cody v. Mello*, 59 F.3d 13, 16 (2d Cir. 1995).

Mr. Wyatt has not cited, in either his oral proffer or in his subsequent brief, authority finding a Fourth Amendment violation requiring suppression in circumstances involving comparable levels of property damage to that he describes. Mr. Wyatt identifies only four <u>specific</u> instances of property damage – broken picture frames, an antique cash register that was broken, a gun case that was "torn up," and an antique weapon that suffered damage in the form of a "scratch." Mr. Wyatt's proffer (and the exhibits he refers to in support of that proffer) conveys the impression that these were all comparatively minor forms of damage; he does not, for example, describe wholesale destruction of large numbers of items, smashing of glass or other fragile items, or other indicia of purposeful damage. Various cases finding similar types of damage have universally found no Fourth Amendment violation, particularly in the absence of evidence that the damage was purposefully or maliciously caused. *See, e.g.*, *Kirkland v. City of New York*, 2007 WL 1541367 (E.D.N.Y. May 25, 2007) ("damage to an antique table, the front door, door frame, and the wall near the door" where police executed a no-knock warrant was "[nothing more than] the ordinary disarray incident to the execution of the warrant"); *Dockery v.*

*Tucker*, 2008 WL 2673307 (E.D.N.Y. Jun 26, 2008) (destruction of two toilets and some electrical fixtures, and damage to ceilings and floors as agents looked for the defendant's hiding places "did not state a claim of constitutional magnitude"), *and cases cited therein*; *compare Jackson ex rel. Jackson v. Suffolk County*, 87 F.Supp.3d 386, 402-03 (E.D.N.Y. 2015) (in suit for civil damages, allegations that officer "threaten[ed] to bust up my TVs, put holes in the walls" and "destroy everything I had," and subsequently proceeded to cut open furniture, tear up rugs, and smash dishes in the driveway sufficiently stated a claim of malicious destruction), *with cases cited therein*. With the possible exception of the instance of ATF agents "taunting" Mr. Wyatt by moving a poster of President Obama from his office to the front of the store – an act whose meaning is decidedly enigmatic -- Mr. Wyatt's proffer contains no suggestion whatsoever that any property damage caused by the ATF agents was purposeful or malicious. Indeed, Mr. Wyatt's own proffer largely suggests the contrary: Mr. Wyatt primarily objects, at some length, to officers carelessly tossing his property "on the floor" or "in a pile." These descriptions are more indicative of negligent handing of property than purposeful destruction.

Under these circumstances, and given the size and scope of the search to be performed and the amount of property properly seized under the warrant, the Court cannot say that the few instances of damage cited by Mr. Wyatt and the lack of facts suggesting malicious or intentional destruction would permit a finding that a Fourth Amendment violation occurred or that suppression was warranted. This analysis is not changed by Mr. Wyatt's remaining contentions – that ATF agents carelessly handled his property (without causing apparent damage) or rudely disposed of it in piles on the floor. Once again, Mr. Wyatt is obligated to come forward with evidence of something more than negligence or careless handling of property on the part of officers, and his proffer does not do so.

      2. <u>Detention of Mr. Wyatt</u>

The Supreme Court has definitively held that police may detain occupants of a residence while conducting a search authorized by a warrant in certain circumstances. *Michigan v. Summers*, 452 U.S. 692, 704-05 (1981); *United States v. Glover*, 211 Fed App'x 811, 813 (10th Cir. Jan. 10, 2007). The use of handcuffs is likewise reasonable where there is a potential risk to officer safety. *Muehler v. Mena*, 544 U.S. 93, 100 (2005).

In *Muelher*, the Supreme Court examined whether it was reasonable for officers to detain suspects for two to three hours while searching real property for weapons. It determined that there is an inherent safety risk in executing a search warrant for weapons, sufficient to justify the detention of (and use of handcuffs on) the target suspec. *Id.* The defendant in *Muehler* also complained, as does Mr. Wyatt, that while she was detained, law enforcement questioned her about other illegal activity – there, her immigration status. The Supreme Court found that officers' questioning of a suspect "does not constitute a seizure" separate from the physical detention, so long as the questioning did not otherwise prolong the detention. *Id.* at 101.

In Mr. Wyatt's case, his proffer suggests that he was initially detained and placed in handcuffs while ATF officers questioned him about the address shown on the warrant and about whether he would produce keys and access codes for the building. It is not clear whether Mr. Wyatt contends that this portion of his detention violates some aspect of the Fourth Amendment, but the Court sees no basis for such an argument. *Muehler* squarely contemplates that detention, even via handcuffs, is appropriate in this context.

Mr. Wyatt's proffer then seems to suggest that, as ATF agents entered the building and began the search, he was offered the option to leave the premises. He expressed an intention to do so, but that he was prevented from leaving by a Wheat Ridge police officer who sought to

question him about another crime, and that this detention lasted for approximately 30-45 minutes. This portion of the detention, arguably,[7] would not be permissible under *Muheler*: according to Mr. Wyatt's proffer, ATF agents had already given him permission to leave the premises when the Wheat Ridge officer interceded and thus prolonged Mr. Wyatt's detention. Assuming, without necessarily finding, that this portion of the detention presents a possible Fourth Amendment violation,[8] the next question is what, if any, remedy could Mr. Wyatt claim.

Normally, when police officers needlessly prolong a detention, the remedy is the suppression of physical evidence that, but for that prolonged detention, would not have been discovered or seized. *See U.S. v. Peralez*, 526 F.3d 1115, 1121-22 (8th Cir. 2008).  Here, however, the physical evidence seized by the ATF officers would have been obtained regardless of whether Mr. Wyatt promptly returned to his home or whether he was improperly detained by the Wheat Ridge officer in the parking lot, as the search of the Gunsmoke premises would have continued in either event.  In such circumstances, suppression of the fruits of the ATF search would not be appropriate.  *See e.g. Hudson*, 547 U.S. at 594 (refusing the remedy of suppression of physical evidence where agents executed search warrant without first knocking and announcing their presence; "the interests that were violated in this case have nothing to do with the seizure of the evidence").  It might also be appropriate to suppress the statements Mr. Wyatt

---

[7]     Mr. Wyatt's proffer does not expressly allege that ATF agents were aware of, much less condoned, the Wheat Ridge officer's questioning.  Federal culpability in the continued detention of Mr. Wyatt would seem to be an essential element of Mr. Wyatt's request for suppression of the fruits of the ATF's warrant based on acts performed by a local police officer.  Nevertheless, in deference to Mr. Wyatt's motion, the Court will assume that Mr. Wyatt could, if called upon to do so, prove facts that establish the ATF's knowledge of and acquiescence in the Wheat Ridge officer's questioning.

[8]     *Muehler* recognizes that detention may last "for the duration of the search." 544 U.S. at 98.  Here, the record reflects that the ATF's search of the premises continued for many hours, long after the Wheat Ridge officer concluded questioning Mr. Wyatt.  Thus, an argument could be made that no Fourth Amendment violation occurred as a result of Mr. Wyatt's continued detention, as ATF agents could have detained him even longer had they opted to do so.

made to the Wheat Ridge officer, but it does not appear that those statements bear on the charges against Mr. Wyatt or that the Government intends to use them in any way in this case.

That leaves Mr. Wyatt to argue that the Wheat Ridge officer's prolonging of his detention for a period of 30-45 minutes was, in and of itself (or, when coupled with the other colorable quarrels Mr. Wyatt has with the circumstances of the search), sufficient to render the entirety of the search so unreasonable as to warrant exclusion of the seized evidence. Mr. Wyatt cites *United States v. Thompson*, 667 F.Supp.2d 758 (S.D. Ohio 2009), where the District Court granted a motion to suppress all fruits from a warrant search of a home because officials refused to show a copy of the warrant to the residents and because police detained one of the residents, in a semi-clothed state, on the back patio for a period of 5 hours while conducting the search without offering her food or water or the opportunity to dress. If nothing else – and this Court is not necessarily persuaded by the entirety of *Thompson*'s reasoning (particularly with regard to the remedy it grants) -- *Thompson* is distinguishable on its facts, as Mr. Wyatt's 30-45 minute detention by the Wheat Ridge officer is hardly comparable to Ms. Thompson's 5-hour detention, to say nothing of the further indignities she suffered that Mr. Wyatt did not. Whatever inconvenience Mr. Wyatt suffered for those 30-45 minutes is not proportional to the societal interests in the admissibility of evidence that was properly seized by ATF agents conducting a search pursuant to a valid warrant inside a premises away from where Mr. Wyatt was being detained. Whether Mr. Wyatt's detention by the Wheat Ridge officer was so unreasonable as to permit him to successfully seek civil damages from that officer in a § 1983 suit is one question; this Court concludes that it is <u>not</u> so unreasonable, individually or collectively, as to permit a remedy in the form of suppression of the physical evidence seized by ATF agents from the Gunsmoke premises.

### 3. Exposing Mr. Wyatt to Media Coverage

The Supreme Court has, on several occasions, held that police officers' inviting members of the media to observe the execution of a warrant to constitute a Fourth Amendment violation. *Wilson v. Layne*, 526 U.S. 603 (1999); *Hanlon v. Berger*, 526 U.S. 808 (1999); *see also Robinson v. City & County of Denver*, 39 F.Supp.2d 1257, 1265 (D. Colo. 1999).

However, this is not what occurred here. Mr. Wyatt does not allege that ATF officials solicited a media presence during the execution of the warrant, much less that they allowed members of the media inside the Gunsmoke premises to observe the search itself. Rather, Mr. Wyatt's arguments are much more limited: when he returned to the property near the conclusion of the search, members of the media had arrived and were filming (apparently from a vantage point on public property – at least Mr. Wyatt does not assert otherwise). He complains that ATF officials refused to let him avoid the media gaze by entering through a back door, instead requiring him to enter through the front door, in full view of the media.

The Court is unable to find a case, and Mr. Wyatt cites none, in which the unsolicited presence of the media, on a public street, observing the execution of a warrant somehow constitutes a violation of a defendant's Fourth Amendment rights. Nor does Mr. Wyatt point to any authority that suggests that agents have some constitutional obligation to assist a defendant in evading the media's gaze. In *Lauro v. Charles*, 219 F.3d 202, 211 (2d Cir. 2000), the court reasoned that "the Fourth Amendment shields arrestees from police conduct that unreasonably aggravates the intrusion on privacy properly occasioned by the initial seizure." Thus, police officers' decisions to stage a re-enactment of the defendant's initial "perp walk" into the police station for the benefit of late-arriving news media was found to be a Fourth Amendment violation. But the court acknowledged that action having "legitimate law enforcement

justification" for an action was a sufficient justification, even if that action incidentally exposed a defendant to public scrutiny. *Id.* at 212-13; *see also Caldarola v. County of Westchester*, 343 F.3d 570, 577 (2d Cir. 2003) (weighing defendant's expectation of privacy at the location of the media encounter against the legitimate governmental interest of documenting the law enforcement process).

Here, Mr. Wyatt does not argue that the ATF agents lacked any legitimate law enforcement purpose in requiring him to return to the store to have him open a safe. Nor does he specifically assert that requiring him to enter the property through the front door lacked any legitimate justification. Although Mr. Wyatt's proffer suggests that he wished to avoid the media's gaze – understandably so – by entering through the back door, he does not indicate that ATF agents promised him that he could do so or that they otherwise induced him to come to the property under false pretenses. Thus, the fact that his arrival at the property had the incidental effect of exposing him to the media is of no constitutional significance; indeed, courts have frequently recognized the significant public interest attendant in the media observing (from a publicly-accessible location) law enforcement's interactions with accused persons. *Id.*, *Brown v. Pepe*, 42 F.Supp.3d 310, 316 (D.Ma. 2014) (rejecting Fourth Amendment claim by defendant subjected to ordinary, media-observed "perp walk" into police station for booking). Certainly, Mr. Wyatt points to no authority that requires law enforcement officials to assist a suspect in avoiding media scrutiny or accommodate the suspect's desire for privacy. So long as law enforcement officials are engaged in legitimate operational functions when the media exposure occurs and the media's presence remains on public property, cases like *Lauro* and *Caldarola* suggest that the Fourth Amendment is satisfied. Nothing in Mr. Wyatt's proffer suggests that

these conditions were not present, and thus, Mr. Wyatt's exposure to media scrutiny does not support a request for suppression.

### 4. Totality of the Circumstances

The preceding analysis disposes of Mr. Wyatt's various complaints individually. In the interests of completeness, the Court also briefly considers whether the aggregation of all of his complaints would yield a colorable Fourth Amendment violation warranting suppression, even if none of them suffice on their own.

The Court finds that they do not. At best, Mr. Wyatt has identified only two types of conduct that even arguably implicate on his Fourth Amendment rights relative to the search: the relatively minor damage to his personal property occurring during the search, and the improper extension of his detention by 30-45 minutes by a Wheat Ridge police officer. Even combined, these acts are not severe enough in their consequences nor egregious enough in their motivations to warrant the extreme remedy of suppression of otherwise validly-obtained evidence. Both are of a quantum more suited to recompense – if any is warranted – by means of a civil suit for damages, not suppression of evidence.

## III. Conclusion

For the foregoing reasons, the Court finds that, even taking Mr. Wyatt's proffer in the light most favorable to him, Mr. Wyatt has failed to articulate facts that, if proven, would warrant the remedy of suppression that he seeks. Accordingly, the Court finds no need to conduct an

evidentiary hearing.  Mr. Wyatt's Motion to Suppress the ATF Search (**# 38, 65)** is therefore DENIED.

DATED this 29th day of November, 2016.

**BY THE COURT:**

*[signature: Marcia S. Krieger]*

Marcia S. Krieger
United States District Court